1  PHILLIP R. KAPLAN (S.B. #76949)
   MARCUS S. QUINTANILLA (S.B. #205994)
2  ANDREW R. ESCOBAR (S.B. #248242)
   O'MELVENY & MYERS LLP
3  610 Newport Center Drive, 17th Floor
   Newport Beach, CA  92660-6429
4  Telephone:     (949) 760-9600
   Facsimile:     (949) 823-6994
5  Email:        pkaplan@omm.com
                 mquintanilla@omm.com
6                aescobar@omm.com

7  Attorneys for Defendants
   WM Advisors, Inc., WM Funds Distributor, Inc.,
8  Edge Asset Management, Inc., Principal Financial
   Group, Inc., Principal Investors Fund, Inc., and
9  Principal Funds Distributor, Inc. (the "Principal
   Group Defendants")

10

11              **UNITED STATES DISTRICT COURT**

12            **SOUTHERN DISTRICT OF CALIFORNIA**

13                    **AT SAN DIEGO**

14

15 | LUZ M. ZAPIEN, Individually and on | Case No.  3:07-CV-00385-DMS-CAB
   behalf of All Others Similarly Situated,

16                                     | **MEMORANDUM OF POINTS AND**
                      Plaintiff,       | **AUTHORITIES IN SUPPORT OF**
17                                     | **PRINCIPAL GROUP DEFENDANTS'**
        v.                             | **MOTION TO DISMISS PURSUANT TO**
18                                     | **FED. R. CIV. P. 9(b) AND 12(b)(6)**

19 WASHINGTON MUTUAL, INC., WM
   TRUST I, WM TRUST II, WM
20 STRATEGIC ASSET MANAGEMENT     | Date:      September 21, 2007
   PORTFOLIOS, LLC, WM FINANCIAL  | Time:      1:30 p.m.
21 SERVICES, INC., WM ADVISORS, INC., | Place:    Courtroom 10, Second Floor
   WM FUNDS DISTRIBUTOR, INC.,    | Judge:    Hon. Dana M. Sabraw
22 EDGE ASSET MANAGEMENT, INC.,
   PRINCIPAL FINANCIAL GROUP, INC., | Filed Concurrently Herewith:
23 PRINCIPAL INVESTORS FUND, INC., | 1. Notice of Hearing on Motion and Motion to
   PRINCIPAL FUNDS DISTRIBUTOR,   |    Dismiss
24 INC.,                           | 2. Request for Judicial Notice
                                    | 3. Declaration of Portia S. Cambel
                      Defendants.   | 4. Appendix of Unreported Authority
25
                                    | Lodged Concurrently Herewith:
26                                   | 1. Proposed Order

27

28

MEMO P'S & A'S IN SUPP PRINCIPAL
                                               GROUP DEFENDANTS' MTD (07CV00385)

**TABLE OF CONTENTS**

**Page**

I.      OVERVIEW ................................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND.......................................... 3

III.    ARGUMENT .................................................................................................. 6

        A.      Plaintiff Cannot, as a Matter of Law, Plead or Prove that the 2004
                Prospectuses Contain Material Misrepresentations or Omissions ......................... 7

                1.      Even Taken in Isolation, the Disclosures Cited in the Complaint Do
                        Not Constitute Material Misrepresentations ............................................... 7

                2.      When the 2004 Prospectuses Are Considered in Their Entirety, The
                        Disclosure Is Not Misleading.......................................................... 9

        B.      Plaintiff Has Not Pleaded Fraud with Particularity and Has Not Pleaded
                Facts to Support a Strong Inference of Scienter................................................ 11

                1.      Plaintiff's Generalized Allegations Are Inadequate and Improper.......... 12

                2.      Plaintiff Has Not and Cannot Plead Facts Establishing a Strong
                        Inference of Scienter. .................................................................. 14

        C.      Plaintiff Has Not and Cannot Plead Cognizable Loss Causation ......................... 16

        D.      As a Matter of Law, Each of Plaintiff's Causes of Action Is Time-Barred.......... 17

                1.      The 2004 Prospectuses Gave Plaintiff Inquiry Notice of the Facts
                        Underlying Her Purported Claims. ............................................. 19

                2.      Even if the 2004 Prospectuses Had Not Fully Uncovered the Facts
                        underlying Plaintiff's Purported Claims, the December 30, 2004
                        Amendment Undeniably Did ......................................................... 21

        E.      The Court Should Dismiss the Complaint as to Those Principal Group
                Defendants Against Whom No Claims Have Been or Can Be Properly
                Asserted.......................................................................................... 24

IV.     CONCLUSION .............................................................................................. 25

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Ackerman v. Northwestern Mut. Life Ins. Co.*,
    172 F.3d 467 (7th Cir. 1999) ............................................................................. 11

5

*Alaska Elec. Pension Fund v. Adecco*,
    371 F.Supp. 2d 1203 (S.D. Cal. 2005) ............................................................... 13

6

7

*In re Alstom SA Sec. Litig.*,
    (S.D.N.Y. 2005) .................................................................................................. 18

8

*Astoria Fed. Savings and Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991) .............................................................................................. 6

9

10

*In re Authentidate Holdings Corp.*,
    No. 05 CV 5323 (LTS), 2006 WL 2034644 (S.D.N.Y. July 14, 2006) ............... 18

11

*Basic v. Levinson*,
    485 U.S. 224 (1988) .............................................................................................. 7

12

13

*Benzon v. Morgan Stanley*,
    420 F.3d 598 (6th Cir. 2005) ...................................................................... 8, 9, 20

14

*Berry v. Valence Tech., Inc.*,
    175 F.3d 699 (9th Cir. 1999) ................................................................................ 7

15

16

*Betz v. Trainer Wortham & Co., Inc.*,
    486 F.3d 590 (9th Cir. 2007) ........................................................................ 18, 19

17

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ........................................................................................ 3, 16

18

19

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................................ 8

20

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993) .............................................................................. 19

21

22

*In re Cabletron Systems, Inc.*,
    311 F.3d 11 (1st Cir. 2002) ................................................................................. 15

23

*Castillo v. Dean Witter Discovery & Co.*,
    Case No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998) ................. 17

24

*Cohen v. Northwestern Growth Corp.*,
    385 F. Supp. 2d 935 (D.S.D 2005) ...................................................................... 18

25

26

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) .............................................................................. 6

27

28

- ii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993) ............................................................................................ 17, 19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................................... 16

*In re Dura Pharm. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ........................................................................ 13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    465 F. Supp. 2d 687 (S.D. Tex. 2006) .......................................................................... 18

*Fitzgerald v. Citigroup, Inc.*,
    No. 03 CV 4305 (DAB), 2007 WL 582965 (S.D.N.Y. June 25, 1998) ............................ 18

*Friedman v. Rayovac Corp.*,
    295 F. Supp. 2d 957 (W.D. Wisc. 2003) ...................................................................... 18

*In re Glenfed, Inc. Sec. Litig.*,
    60 F.3d 591 (9th Cir. 1995) .......................................................................................... 13

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...................................................................................... 13

*In re Immune Response Sec. Litig.*,
    375 F.Supp. 2d 983 (S.D. Cal. 2005) ............................................................................ 13

*In re Infonet Servs. Corp.  Sec. Litig.*,
    310 F. Supp. 2d 1106 (C.D. Cal. 2003) .............................................................. 7, 19, 22

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980).......................................................................................... 6

*In re JP Morgan Chase Sec. Litig.*,
    363 F.Supp.2d 595 (S.D.N.Y. 2005)............................................................................ 12

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (S.D.N.Y. 2003)........................................................................... 11

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991).................................................................................................... 18

*In re Lernout & Hauspie Sec. Litig.*,
    230 F. Supp. 2d 152 (D.Mass. 2002) .......................................................................... 14

*Lieberman v. Cambridge Partners, L.L.C.*,
    Civ. A 03-2317, 2004 WL 1396750 (E.D. Pa. June 21, 2004) ............................................ 18

*Mack v. South Bay Beer Distrib., Inc.*,
    798 F.2d 1279 (9th Cir. 1986).......................................................................................... 6

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
       437 F.3d 588 (7th Cir. 2006)................................................................................ 13

4
    *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
5      339 F.3d 1087 (9th Cir. 2003)................................................................................ 7

6   *In re Merrill Lynch Invest. Mgt. Funds Sec. Litig.*,
       434 F. Supp. 2d 233 (S.D.N.Y. 2006)................................................................ 9, 17
7
    *Moore v. Kayport Package Express, Inc.*,
8      885 F.2d 531 (9th Cir. 1989)................................................................................ 11

9   *In re Morgan Stanley & Van Kampen Mutual Fund Litig.*,
       No. 03 CV 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) .................... 8
10
    *Mullis v. United States Bank Ct.*,
11     828 F.2d 1385 (9th Cir. 1987)................................................................................ 6

12  *Phillips v. Scientific-Atlanta, Inc.*,
       374 F.3d 1015 (11th Cir. 2004)............................................................................ 13
13
    *Retirement Sys. v. Hunter*,
14     477 F.3d 162 (4th Cir. 2007)................................................................................ 15

15  *In re Salomon Smith Barney Mutual Fund Fees Litig.*,
       441 F. Supp. 2d 579 (S.D.N.Y. 2006)................................................................ 16, 17
16
    *In re Silicon Graphics Inc. Sec. Litig.*,
17     183 F.3d 970 (9th Cir. 1999)...................................................................... 2, 6, 12, 14

18  *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*,
       365 F.3d 353 (5th Cir. 2004)................................................................................ 13
19
    *In re Stac Elec. Sec. Litig.*,
20     89 F.3d 1399 (9th Cir. 1996)................................................................................ 7, 9

21  *Sterlin v. Biomune Sys.*,
       154 F.3d 1191 (10th Cir. 1998)............................................................................ 18, 20
22
    *Sterlin v. Biomune Sys., Inc.*,
23     114 F. Supp. 2d 1163 (D. Utah 2000) .................................................................. 19

24  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
       -- S.Ct. --, 2007 WL 1773208 (June 21, 2007) ............................................ 13, 14
25
    *In re Tibco Software, Inc.*,
26     No. C. 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006).................... 13

27  *In re Vantive Corp. Sec. Litig.*,
       283 F.3d 1079 (9th Cir. 2002)............................................................................ 12, 15
28

**TABLE OF AUTHORITIES**
(continued)

Page

*In re VeriFone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993).................................................................................. 6

*Vess v. Ciba-Geigy Corp. USA*,
  317 F. 3d 1097 (9th Cir. 2003)........................................................................... 11

*Weisbuch v. County of Los Angeles*,
  119 F.3d 778 (9th Cir. 1997)................................................................................ 6

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
  67 F.3d 605 (7th Cir. 1995)................................................................... 7, 19, 22

*White v. Melon*,
  757 F. Supp. 267 (S.D.N.Y. 1991).................................................................... 11

*Wool v. Tandem Computers, Inc.*,
  818 F.2d 1433 (9th Cir. 1987)............................................................................ 14

*In re Worldcom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 431 (S.D.N.Y. 2003)............................................................... 18

**STATUTES**

15 U.S.C. § 77k................................................................................................. 5, 7

15 U.S.C. § 77*l*.................................................................................................... 5

15 U.S.C. § 77*l*(a)................................................................................................ 7

15 U.S.C. § 77*o*.................................................................................................. 5

15 U.S.C. § 78j(b).............................................................................................. 5, 7

15 U.S.C. § 78t.................................................................................................... 5

15 U.S.C. § 78u-4(b).................................................................................... 11, 12

15 U.S.C. § 78u-4(b)(1)...................................................................................... 12

15 U.S.C. § 78u-4(b)(2)...................................................................................... 13

15 U.S.C. § 77m.................................................................................................. 17

17 C.F.R. § 240.10b-10........................................................................................ 5

17 C.F.R. § 240.10b-5.......................................................................................... 5

The Private Securities Litigation Reform Act of 1995 (the "Reform Act") ......................... passim

- v -                          MEMO P'S & A'S IN SUPP PRINCIPAL
                                                                          GROUP DEFENDANTS' MTD (07CV00385)

**TABLE OF AUTHORITIES**
(continued)

**Page**

The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745,
28 U.S.C. §1658(B), Section 804(a) ......................................................................... 17

The Securities Act of 1933, Section 11......................................................... 5, 9, 17, 18

The Securities Act of 1933, Section 12(a)(2)................................................... 5, 17, 18

The Securities Act of 1933, Section 13........................................................................ 17

The Securities Act of 1933, Section 15............................................................ 5, 17, 18

The Securities Exchange Act of 1934, Section 10(b) ...................................... 5, 17, 18

The Securities Exchange Act of 1934, Section 20........................................... 5, 17, 18

**OTHER AUTHORITIES**

Harold S. Bloomenthal, *Securities Law Handbook, Vol. I*, § 13.47 .............................. 4

**RULES**

Federal Rule of Civil Procedure, Rule 12(b)(6)..................................................... 2, 6, 11

Federal Rule of Civil Procedure, Rule 9(b) ......................................................... 2, 11, 12

Securities and Exchange Commission Rule 10b-10 ...................................................... 5

Securities and Exchange Commission Rule 10b-5 ....................................................... 5

I.        **OVERVIEW**

         In this putative class action, plaintiff Luz M. Zapien ("Plaintiff") purports to represent all customers of defendant WM Financial Services, Inc. who purchased shares in certain mutual funds issued by defendants WM Trust I, WM Trust II, and WM Strategic Asset Management Portfolios, LLC (collectively, the "Funds")[1] between March 1, 2004 and March 1, 2005.  (Compl. ¶ 2.)  The gravamen of Plaintiff's Complaint is the allegation that the Funds' 2004 prospectuses and registration statement somehow misled investors by indicating that the distributor of the Funds (defendant WM Funds Distributor, Inc.) and the investment advisor to the Funds (defendant WM Advisors, Inc.) *"may"* provide additional compensation to WM Financial Services and its sales staff for marketing the Funds.  (*Id.* ¶ 30.)  According to Plaintiff, this representation was materially misleading because, in actual fact, WM Funds Distributor and WM Advisors *were already providing* such compensation under existing contracts.  (*Id.*)  Plaintiff contends that this was a material misrepresentation because, had she known that revenue-sharing contracts were already in place – as opposed to being a mere possibility – she would never have purchased any shares in the Funds.  (*Id.* at ¶ 43.)

         Plaintiff does not (and cannot) allege that the Funds failed to disclose the total amount of the distribution and advisor fees they paid, nor that such fees exceeded industry norms.  Nevertheless, she claims to have suffered the (indirect) consequences associated with the Funds' paying distribution and advisor fees that were used, at least in part, to defray the costs of revenue sharing.  (*Id.*)  Plaintiff maintains that, if she had known revenue sharing was already taking place, she would have purchased some other (unspecified) investment, which (for unspecified reasons) would necessarily have yielded greater returns.  (*Id.*)

         In addition to suing the Funds themselves, WM Funds Distributor, WM Advisors, and

---

[1] Plaintiff seeks to represent purchasers of the following mutual funds issued by the Funds: Money Market, Tax-Exempt Money Market, U.S. Government Securities, Income, High Yield, Tax-Exempt Bond, REIT, Small Cap Value, Equity Income, Growth & Income, West Coast Equity, Mid Cap Stock, California Money, Short Term Income, California Municipal, California Insured Intermediate Municipal, Growth, International Growth, Small Cap Growth, Strategic Growth, Conservative Growth, Balanced, Conservative Balanced, and Flexible Income.  (Compl. ¶ 1 n.1.)  However, as noted below, Plaintiff has certified that she herself purchased shares from only two such mutual funds:  Growth & Income and West Coast Equity.

1    WM Financial Services, and their alleged parent entity, Washington Mutual, Inc., under various

2    specific causes of action, Plaintiff has also named as defendants the Principal Financial Group,

3    Inc., and certain related entities, presumably because a Principal subsidiary acquired WM Funds

4    Distributor, WM Advisors, and the assets of the Funds after the close of the putative class period.

5    This Memorandum of Points and Authorities is submitted on behalf of those Principal-related

6    entities, as well as defendants WM Funds Distributor and WM Advisors (collectively, the

7    "Principal Group Defendants").

8                          *        *        *        *        *

9            If this case were fully litigated, defendants would show that Plaintiff was in no way

10   harmed by her investment in the Funds and that, far from being improperly steered into

11   underperforming investments, Plaintiff enjoyed the benefit of mutual funds that were well-suited

12   to her needs and which performed as well as or better than comparable investments.  Plaintiff,

13   however, cannot put defendants to that costly and unnecessary exercise because the Complaint

14   should be dismissed in its entirety pursuant to Rules 9(b) and 12(b)(6)  of the Federal Rules of

15   Civil Procedure.

16           Plaintiff's complaint suffers from numerous, incurable defects and must be dismissed with

17   prejudice.[2]  First, whether read in isolation or in full context, the representations contained in the

18   2004 Prospectuses were neither false nor misleading.  Second, Plaintiff's vague and generalized

19   scienter allegations of fraud do not remotely suggest that the defendants intended to deceive, and

20   they fall woefully short of the heightened pleading requirements of Rule 9(b) and the Private

21   Securities Litigation Reform Act of 1995 (the "Reform Act").  *See In re Silicon Graphics Inc.*

22   *Sec. Litig.*, 183 F.3d 970, 977–78 (9th Cir. 1999) ("Congress designed the [Reform Act] to deter

23   non-meritorious lawsuits by creating procedural barriers such as heightened pleading

24   standards.").  What is more, even if the defendants had somehow misled the class Plaintiff

25   purports to represent, Plaintiff cannot establish that the defendants' alleged misrepresentations

26

27   _____
     [2] In addition to the arguments set forth in this Memorandum of Points and Authorities, the
     Principal Group Defendants join in any other pertinent arguments articulated in the moving
28   papers of defendants Washington Mutual and WM Financial Services.

1  caused her any economic harm.  In addition, even if Plaintiff could articulate some causal link

2  between the defendants' alleged misconduct and some cognizable injury, her claims are

3  nevertheless clearly barred by the applicable statutes of limitations because she was placed on

4  inquiry notice of the alleged fraud by the 2004 Prospectuses themselves or, at the very latest, by

5  the amendments to those prospectuses published on December 30, 2004.  Finally, setting aside

6  these defects, the Court should dismiss most of the Principal Group Defendants from this lawsuit

7  because no claims have been specified against them or because, as a matter of law, certain claims

8  may not be levied against them.

9  **II.     FACTUAL AND PROCEDURAL BACKGROUND**

10          Although the Complaint does not specify the date on which Plaintiff allegedly purchased

11  her shares, that fact may be taken from the untimely certification submitted in support of her

12  motion for appointment as lead plaintiff.[3]  According to Plaintiff's certification, she purchased an

13  aggregate of $5,000 worth of Class A shares of the WM Growth & Income Fund and the West

14  Coast Equity Fund in the year 2000.  (Cambel. Decl., Exh. A.)  Although the certification lacks

15  specificity, it appears to indicate that, after this initial purchase, there were subsequent

16  (unquantified) purchases from the same two funds – possibly automatic purchases through the

17  "Reinvest Option" to which Plaintiff's certification alludes.  (*Id.*)  Plaintiff nowhere specifically

18  alleges that she purchased any shares during the putative class period.  This alone is fatal to

19  Plaintiff's claims.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730–32 (1975).

20          Nevertheless, for purposes of the Complaint – and defendants' motion to dismiss – the

21  next significant event took place approximately four years later, on February 27, 2004, when the

22  Funds jointly filed the amended Form N-1A Registration Statement that, according to Plaintiff,

23  contains the misrepresentations at issue in this lawsuit.  The Registration Statement included

24  Fund Prospectuses (Part A) and a Statement of Additional Information ("SAI") (Part B) as well as

25  ────────────────

26  [3] *See* Certificate of Named Plaintiff Pursuant to Federal Securities Laws (May 1, 2007), a true and correct copy of which is submitted concurrently herewith as Exhibit A to the Declaration of Portia S. Cambel ("Cambel Decl."), and of which judicial notice is requested in the Principal Group

27  Defendants' concurrently-filed Request for Judicial Notice.  (Plaintiff's certification was originally filed as Exhibit B to Jeffrey R. Krinsk's declaration in support of Plaintiff's motion for

28  appointment as lead plaintiff.)

1    other extensive information including exhibits showing, *inter alia*, significant contracts between

2    Fund distributors and broker-dealers (Part C).  (As in the Complaint (¶ 29), this three-part

3    Registration Statement is referred to here collectively as the "2004 Prospectuses.")[4]  Although the

4    Funds proposed that the SEC make the 2004 Prospectuses effective as of March 1, 2004, the 2004

5    Prospectuses were made available to the public on the SEC's website immediately, on February

6    27, 2004.[5]

7         As noted above, Plaintiff contends that the 2004 Prospectuses were materially misleading

8    because they indicated that revenue sharing was a mere possibility when, in actual fact, specific

9    contracts for revenue sharing were already in place.  (As shown in the discussion below, this

10   allegation is based on a selective and misleading reading of the Prospectuses themselves:  when

11   read as a whole, the 2004 Prospectuses make it abundantly clear that WM Funds Distributor and

12   WM Advisors were then presently engaged in revenue-sharing arrangements.)

13        Then, on December 30, 2004 – ten months after the 2004 Prospectuses were filed – the

14   Funds filed an amended Registration Statement (the "December 30, 2004 Amendment").[6]

15   Although the Funds proposed that the SEC make the December 30, 2004 Amendment effective as

16   of March 1, 2005, the Amendment was, like the 2004 Prospectuses themselves, posted on the

17   SEC's website the same day it was filed.  Like the 2004 Prospectuses, the December 30, 2004

18   Amendment made it clear that revenue-sharing arrangements were already in place among WM

19   Financial Services, WM Funds Distributor, and WM Advisors.  Indeed, the December 30, 2004

20

21   [4] A true and correct copy of relevant excerpts from the 2004 Prospectuses, including the digital
     filing stamp showing when the 2004 Prospectuses were received by the SEC is filed concurrently
22   herewith as Exhibit B to the Declaration of Portia S. Cambel.

23   [5] The effective date of a registration statement is the day on which registrants are held
     accountable for the truthfulness of its contents; *i.e.*, Section 11 liability attaches only to
24   representations that are false or misleading on or after the registration statement's effective date.
     The proposed effective date has nothing to do with the date on which the registration statement is
25   made available to the public.  *See* Harold S. Bloomenthal, *Securities Law Handbook, Vol. I*, §
     13.47 at 914 (Regardless of effective date proposed by registrant, securities "[f]ilings are now
26   available at the [SEC's] EDGAR database on a real time basis so that filings can be accessed the
     same day they are received by the [SEC].").

27   [6] A true and correct copy of relevant excerpts from the December 30, 2004 Amendment,
     including the digital filing stamp showing when the Amendment was received by the SEC is filed
28   concurrently herewith as Exhibit C to the Declaration of Portia S. Cambel.

NB1:719636.1

MEMO P'S & A'S IN SUPP PRINCIPAL
GROUP DEFENDANTS' MTD (07CV00385)

1   Amendment emphasized existing revenue-sharing arrangements by referencing them repeatedly

2   in paragraphs set forth in all capital letters.[7]  After the filing of the December 30, 2004

3   Amendment, approximately 26 months passed before Plaintiff filed her Complaint on February

4   28, 2007.  As discussed below, Plaintiff's claims are thus barred by the statutes of limitations.

5        Plaintiff's Complaint asserts causes of action under Sections 11, 12(a)(2), and 15 of the

6   Securities Act of 1933[8] (the "Securities Act") (Counts 1, 2, and 3).  It also asserts causes of action

7   under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act") and

8   Rules 10b-5 and 10b-10 of the Securities and Exchange Commission[9] ("SEC") (Counts 4, 5, and

9   6).  The elements of these claims differ in various ways, but each seeks recovery based on

10  damages stemming from alleged misrepresentations or omissions in the 2004 Prospectuses.  No

11  other misrepresentations are alleged.

12       Counts 1, 2, 4, and 5 are directed against an undifferentiated group of entities designated

13  as "WAMU."  This group comprises:  (1) WM Trust I; (2) WM Trust II; (3) WM Strategic Asset

14  Management Portfolios, LLC; (4) WM Financial Services; (5) WM Funds Distributor; and

15  (6) WM Advisors.  (*Id*. ¶¶ 11-16, 21.)  Counts 3 and 6 of the Complaint are asserted against

16  Washington Mutual, Inc., on the theory that Washington Mutual is the control person for one or

17  more of the preceding defendants.  (*Id.* ¶¶ 71 and 94.)

18       Although the Complaint asserts no cause of action against them, it also names as

19  defendants the Principal Financial Group, Inc.; Principal Investors Fund, Inc.; Principal Funds

20  Distributor, Inc.; and Edge Asset Management, Inc.  (*Id.* ¶¶ 17-20.)  As noted earlier, these latter

21  entities are apparently named as defendants because, after the close of the class period at issue in

22  the Complaint, WM Funds Distributor and WM Advisors were acquired by a subsidiary of

23  defendant Principal Financial Group and were thereafter respectively renamed Principal Funds

24

25  [7] Given that Plaintiff chose to limit her putative class period to dates before March 1, 2005 – the
    proposed effective date of the December 30, 2004 Amendment – Plaintiff appears to recognize
26  that the December 30, 2004 Amendment adequately disclosed the facts giving rise to her
    purported claims.

27  [8] 15 U.S.C. §§ 77k, 77*l*, and 77*o*.

28  [9] 15 U.S.C. §§ 78j(b) and 78t; 17 C.F.R. §§ 240.10b-5 and 240.10b-10.

1   Distributor and Edge Asset Management.[10]  As discussed below, the failure to allege any facts

2   against these defendants, let alone facts meeting the Reform Act's requirements for specificity in

3   pleading fraud or scienter, doom Plaintiff's claims against them.

4        For the reasons detailed below, each of the Complaint's causes of action should be

5   dismissed with prejudice.

6   **III.**    **ARGUMENT**

7        Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court should dismiss a

8   plaintiff's complaint when the judicial admissions contained in the complaint make it clear that

9   the plaintiff will be unable to prove any set of facts that would entitle her to relief.  *See Weisbuch*

10  *v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997); *Jablon v. Dean Witter & Co.*,

11  614 F.2d 677, 682 (9th Cir. 1980).  When ruling on such a motion, a court should accept as true

12  all of the plaintiff's material, well-pleaded, factual allegations, but "conclusory allegations of law

13  and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a

14  claim."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993).

15       In adjudicating a motion to dismiss, the court may properly take judicial notice of facts

16  that are not susceptible to reasonable dispute, including materials filed with the SEC.  *See In re*

17  *Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).  The court should not accept

18  as true any factual allegations that contradict such judicially noticed materials.  *See Mullis v.*

19  *United States Bank Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).  Material that is subject to judicial

20  notice may be considered without converting the motion into one for summary judgment.  *See*

21  *Mack v. South Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  *Abrogated on other*

22  *grounds by Astoria Fed. Savings and Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).

23       Where, as here, "it is clear that no amendment could save [the] complaint[,]" the action

24  should be dismissed with prejudice.  *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir.

25  2000); *see also McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339

26

27  [10] Principal Financial Group, Inc. and Washington Mutual, Inc. remain separate companies, and
Principal Financial Group, Inc. did not acquire WM Financial Services, Inc., or the Funds
28  themselves.

1   F.3d 1087, 1096 (9th Cir. 2003) (same).

2       **A.      Plaintiff Cannot, as a Matter of Law, Plead or Prove that the 2004**
        **Prospectuses Contain Material Misrepresentations or Omissions.**
3

4           The elements of Plaintiff's claims vary from one another in particulars, but each count in

5   the Complaint requires Plaintiff to plead and prove that the 2004 Prospectuses contained a

6   materially false statement or a materially misleading omission, regarding facts that the defendants

7   had an obligation to disclose.  *See* 15 U.S.C. §§ 77k and 77*l*(a); 15 U.S.C. §§ 78j(b).  A

8   misstatement is material if there is a substantial likelihood that a reasonable investor would

9   consider it important in his or her decision-making.  *Basic v. Levinson*, 485 U.S. 224, 231-32

10  (1988).  In this context, the standard for materiality requires that the 2004 Prospectuses "omitted

11  fact[s that] would have been viewed by the reasonable investor as having significantly altered the

12  'total mix' of information made available."  (*Id*.)

13          In assessing whether the Plaintiff can satisfy that test, the Court may take judicial notice

14  of the content of public SEC filings, whether or not set forth in the complaint, and should

15  consider the full text of the relevant documents – not merely the excerpts cited by the Plaintiff.

16  *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).  Knowledge of such

17  public records is imputed to all reasonable investors.  *Whirlpool Fin. Corp. v. GN Holdings, Inc.*,

18  67 F.3d 605, 610 (7th Cir. 1995) (quoted in *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 (9th

19  Cir. 1999)).  *Accord In re Infonet Servs. Corp.  Sec. Litig.*, 310 F. Supp. 2d 1106 (C.D. Cal.

20  2003).

21          In view of the allegations and admissions in the Complaint itself, and the content of the

22  2004 Prospectuses taken as a whole, the statements identified in the Complaint cannot qualify as

23  material misrepresentations or omissions, and each of Plaintiff's causes of action must fail as a

24  matter of law.

25          **1.      Even Taken in Isolation, the Disclosures Cited in the Complaint**
                **Do Not Constitute Material Misrepresentations.**
26

27          The only allegedly misleading disclosures to which the Complaint refers are the following

28  passages from the 2004 Prospectuses:

                                    - 7 -

WM Advisors may make payments, at its expense, to dealers or other financial intermediaries at an annual rate of up to 0.50% of the average daily net assets of shares of the Portfolios.[¶]

The Distributor, at its expense, may provide additional compensation to dealers. These payments generally represent a percentage of a qualifying dealer's sales and/or the value of shares of the Portfolios or Funds within a qualifying dealer's client accounts.  Such payments may also include reimbursement for expenses associated with qualifying dealers' conferences, transaction (or "ticket") charges and general marketing expenses. … [¶]

The Distributor may, from time to time, pay to dealers, in connection with retail sales or the distribution of shares of a Portfolio or Fund, material compensation in the form of promotional material or educational meetings.  Salespersons, including representatives of WM Financial Services, Inc. (a subsidiary of Washington Mutual), and any other person entitled to receive any compensation for selling or servicing Portfolio or Fund shares may receive different compensation with respect to one particular class of shares over another, and may receive additional compensation or other incentives for selling Portfolio or Fund shares.

(Compl. ¶ 30; ellipses and emphasis added by Complaint.)

Plaintiff contends that the above-quoted language is deceptive because it characterizes revenue sharing as something that the defendants "may" undertake, rather than a program that is already in place.  First, current SEC regulations, including Form N1-A impose no obligation to disclose the allocation of broker compensation.  *In re Morgan Stanley & Van Kampen Mutual Fund Litig.*, No. 03 CV 8208 (RO), 2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006); *Benzon v. Morgan Stanley*, 420 F.3d 598, 612 (6th Cir. 2005).  But regardless, as a matter of law, the use of the word "may" does not significantly alter the total mix of available information in a way that a reasonable investor would view as important.  *See Benzon*, 420 F.3d at 612.

The 2004 Prospectuses did not conceal the revenue-sharing.  *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1007 (9th Cir. 2002).  Indeed, as the Complaint itself concedes, the disclosure in the 2004 Prospectuses would lead a reasonable investor to conclude that revenue sharing "*may* or *may not*" be taking place.  (*See* Compl. ¶ 33; emphasis in original.)  Assuming (as Plaintiff incorrectly does) that revenue sharing amounts to some sort of "kickback" scheme, it is inconceivable that a reasonable investor would react any differently to the disclosure that such a scheme "may" be in place than she would to the disclosure that the scheme exists.  In either case, a reasonable investor would have cause to consider the possibility that her broker's advice might be influenced by the prospect of revenue sharing and, if concerned, would have the same

1   motivation either to make further inquiries or to choose a different investment or broker.  As the

2   Sixth Circuit has expressly held, the distinction between disclosing that there "may be" revenue

3   sharing versus disclosing that "there is" revenue sharing is, at best, a "semantic quibble."  *Benzon*,

4   420 F.3d at 612; *see also In re Merrill Lynch Invest. Mgt. Funds Sec. Litig.*, 434 F. Supp. 2d 233,

5   238 (S.D.N.Y. 2006) (where total fees are disclosed, their allocation through revenue sharing is

6   immaterial).

7             **2.    When the 2004 Prospectuses Are Considered in Their Entirety,
                       The Disclosure Is Not Misleading.**
8

9             Yet, even assuming that the language quoted in the Complaint were somehow inadequate

10   standing alone, once that language is considered in light of the remaining portions of the 2004

11   Prospectuses (*see Stac*, 89 F.3d at 1405 n.4), it is clear that the quoted passages could not have

12   affected the total mix of available information.  Specifically, Part C of the 2004 Prospectuses

13   contains an exemplar of the Broker-Dealer Agreement currently in place among WM Funds

14   Distributor, WM Advisors, and the various Broker-Dealers that sell the funds, including WM

15   Financial Services.  Among other things, the form Broker-Dealer Agreement makes it clear that

16   revenue-sharing arrangements referenced in the 2004 Prospectuses ***are in fact already in place***.

17   For example, Paragraph 10(e) of the Broker-Dealer Agreement provides as follows:

18                 In addition to the fees set forth above in this paragraph 10, [WM
                   Funds Distributor] agrees, subject to the other terms and conditions
19                 of this Agreement, to pay Selling Broker-Dealer a service fee, and
                   Selling Broker-Dealer agrees to accept the same as full payment for
20                 the services described in Section 11 hereof, accrued daily and
                   payable monthly at the annual rate of 0.25% of the average daily
21                 net assets of Shares of the Customers for which Selling Broker-
                   Dealer is designated as the dealer of record.  [WM Funds
22                 Distributor] reserves the right to change the rate at which such
                   service fee is paid upon fifteen (15) days prior written notice to
23                 Selling Broker-Dealer.

24   (Cambel Decl. , Exh. B, Broker-Dealer Agreement, at 26.)

25             Then, at Paragraph 11, the form Broker Dealer Agreement specifies the services that the

26   broker-dealer is to provide in consideration for the above-described revenue-sharing payment:

27                 Selling Broker-Dealer will provide shareholder servicing, such as,
28                 but not limited to, responding to Customer inquiries and providing

1    account information.

2  (*Id.* at 27.)

3    In other words, the form Broker-Dealer Agreement explicitly states that WM Funds

4  Distributor pays broker-dealers a fixed percentage of the total value of Fund shares that they sell.

5  These revenue-sharing payments are made, among other things, in consideration for the broker-

6  dealers' promise to respond to customer inquiries and to provide information about the Funds –

7  *i.e.*, for promoting the Funds.

8    In addition, at the bottom of the signature page of the form Broker-Dealer Agreement,

9  there is an endorsement for signature by WM Advisors.  It reads as follows:

10    Whereas WM Advisors, Inc. recognizes that it will benefit from the
      sale of Shares of WM Strategic Asset Management Portfolios, LLC,
11    WM Advisors, Inc. hereby agrees to pay to Selling Broker-Dealer,
      with respect to Shares of WM Strategic Asset Management
12    Portfolios, LLC, a fee accrued daily and payable monthly at the
      annual rate of 0.50% (0.25% for Class C Shares) of the average
13    daily net assets of such Shares held by Customers for whom Selling
      Broker-Dealer is the dealer of record, which fee is in addition to
14    any dealer allowance, Sales Commissions and/or service fees
      payable by [WM Funds Distributor] as set forth above.  WM
15    Advisors reserves the right to change the amount of, or to cease
      paying, this fee upon fifteen (15) days prior written notice to
16    Selling Broker-Dealer.

17  (*Id.* at 31.)

18    Thus, the form Broker-Dealer Agreement included in the 2004 Prospectuses makes it clear

19  that – like WM Funds Distributor – WM Advisors is currently engaged in revenue sharing based

20  on the total value of Fund shares that the broker-dealer has sold to the public.  The Agreement

21  explicitly states the motivation behind such payments – namely, the awareness that WM Advisors

22  will benefit from the sale of the Funds shares.  These provisions illustrate the revenue-sharing

23  arrangements then currently in place, which Plaintiff alleges the 2004 Prospectuses concealed.

24    Significantly, the form Broker-Dealer Agreement also specifies that the contemplated

25  revenue-sharing payments may be terminated on 15 days written notice from either WM Funds

26  Distributor or WM Advisors.  This provision underscores why it was entirely appropriate for the

27  prospectuses to characterize the revenue-sharing payments as sums that ***may*** be paid:  given that

28  the standard revenue-sharing contract permitted the payments to be discontinued or adjusted at

1    any time, and given that the existence of revenue sharing might vary at any given time from one

2    broker-dealer to another, to have stated in the prospectuses that revenue-sharing payments *"are"*

3    being made could easily have proved inaccurate from month to month and dealer to dealer.

4         In short, the disclosures in the 2004 Prospectuses were entirely truthful and in no way

5    misleading.  The text cited in Plaintiff's Complaint could not have materially altered the total mix

6    of available information.  Given that every one of Plaintiff's causes of action requires the proof of

7    a material misstatement or omission, the Complaint should be dismissed in its entirety with

8    prejudice.  *See White v. Melon*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991) (holding that securities

9    fraud complaint must be dismissed where "the allegedly omitted or misrepresented information

10   was in fact appropriately disclosed"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377

11   (S.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is

12   premised on the nondisclosure of information that was actually disclosed").

13   **B.    Plaintiff Has Not Pleaded Fraud with Particularity and Has Not
         Pleaded Facts to Support a Strong Inference of Scienter.**

14

15        Under Rule 9(b) of the Federal Rules of Civil Procedure, in all averments of fraud or

16   mistake, the circumstances constituting the fraud or mistake must be stated with "particularity."

17   A plaintiff must allege "the who, what, where and when" of the alleged fraud.  *Ackerman v.*

18   *Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).  Allegations that are vague or

19   conclusory do not satisfy Rule 9(b)'s particularity requirement.  *See, e.g., Moore v. Kayport*

20   *Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  Therefore, when fraud allegations are

21   not pleaded with sufficient particularity, the court must disregard them entirely in judging

22   whether the plaintiff has stated a claim; if not, dismissal is proper under Fed. R. Civ. P. 12(b)(6).

23   *See Vess v. Ciba-Geigy Corp. USA*, 317 F. 3d 1097, 1105 (9th Cir. 2003).

24        In addition, private claims of securities fraud are governed by the heightened pleading

25   requirements of the Reform Act.[11]  Under the Reform Act, a complaint must "specify each

26   statement alleged to have been misleading, the reason or reasons why the statement is misleading,

27   and if an allegation regarding the statement or omission is made on information and belief, the

28   _____
     [11] 15 U.S.C. § 78u-4(b).

1   complaint shall state *with particularity all facts* on which that belief is formed."  15 U.S.C.

2   § 78u-4(b)(1).  This requirement regarding pleadings on information and belief applies to all

3   complaints in which the plaintiff has not first demonstrated that she has personal knowledge of

4   the facts.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 n.3 (9th Cir. 2002).  This

5   means that, under the Reform Act, it is not enough for a plaintiff to assert that the defendant

6   misleadingly failed to disclose some series of facts.  The plaintiff must plead, in detail, what the

7   true facts are, and state "with particularity all facts on which [her] belief is formed."  *Silicon*

8   *Graphics*, 183 F.3d at 985 ("[I]n the absence of such specifics, we cannot determine whether

9   there is any basis for alleging that the [defendants] knew that their statements were false at the

10   time they were made.").

11               **1.      Plaintiff's Generalized Allegations Are Inadequate and Improper.**

12        Plaintiff's fraud allegations fail the requirements of Rule 9(b) and the Reform Act in at

13   least three respects.  First, Plaintiff specifies the precise statements that Plaintiff asserts are false

14   or misleading, but she does not set forth the purported true facts in anything but conclusory form.

15   For example, the Complaint asserts that the 2004 Prospectuses concealed the defendants'

16   revenue-sharing arrangements, but it does not provide any detail on what those arrangements

17   actually were, nor does it specify the amounts at issue, nor the conditions under which payments

18   were made.  Plaintiff's conclusory assertions regarding "kickbacks" and "preferred lists" cannot

19   substitute for concrete factual allegations.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp.

20   2d 595, 632 (S.D.N.Y. 2005) (dismissing securities fraud claims where plaintiffs offered only

21   "conclusory assertion that … investment opportunities were provided as 'kickbacks'").

22        Second, the Plaintiff's allegations do not specify how she learned the truth.  Apart from a

23   generic reference to counsel's research into public filings (Compl., Initial Paragraph), Plaintiff

24   does not provide any hint as to where she gathered the alleged true facts, nor does she indicate

25   where those facts were first made known.  As noted above, Plaintiff appears to recognize that the

26   December 30, 2004 Amendment fully disclosed all the relevant facts but, without any specific

27   allegation in the Complaint, defendants and the Court are left to speculate.  Under the Reform

28

- 12 -          MEMO P'S & A'S IN SUPP PRINCIPAL
                                                          GROUP DEFENDANTS' MTD (07CV00385)

1  Act, this is unacceptable.[12]

2         Third, Plaintiff has not even attempted to connect each of the specific defendants to the

3  alleged misrepresentations or omissions.  In fact, Plaintiff has not so much as alleged which

4  defendants signed or approved the 2004 Prospectuses.  *Cf. Howard v. Everex Sys., Inc.,* 228 F.3d

5  1057, 1061 (9th Cir. 2000) (noting that signers of corporate filings are responsible for the

6  statements therein).  Instead, under the generic term "WAMU" she has asserted claims against a

7  host of different entities – including not only the Funds but also WM Funds Distributor, WM

8  Advisors, and WM Financial Services – entities which are not responsible for developing

9  prospectus language.  The Reform Act does not permit such group pleading because, as explained

10  below, it requires the plaintiff to plead facts supporting an inference of fraudulent intent or

11  "scienter" as to **each individual defendant**.  *See* 15 U.S.C. § 78u-4(b)(2); *Southland Sec. Corp. v.*

12  *Inspire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004); *Makor Issues & Rights, Ltd. v.*

13  *Tellabs, Inc.*, 437 F.3d 588, 602-603 (7th Cir. 2006) (reversed on other grounds[13]); *Phillips v.*

14  *Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004); *In re Dura Pharm. Sec. Litig.*, 452

15  F. Supp. 2d 1005, 1031 (S.D. Cal. 2006) ("This Court has joined other courts in this district and

16  concluded the group pleading doctrine did not survive the PSLRA."); *In re Tibco Software, Inc.*,

17  No. C. 05-2146 SBA, 2006 WL 1469654, at *27 (N.D. Cal. May 25, 2006) ("[C]ourts in this

18  district are increasingly finding that the group pleading doctrine is contrary to the PSLRA");

19  *Alaska Elec. Pension Fund v. Adecco*, 371 F.Supp. 2d 1203, 1220-21 (S.D. Cal. 2005); *In re*

20  *Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1029-30 (S.D. Cal. 2005).[14]

21   
   [12] As discussed in further detail below, Plaintiff's failure to identify where she first learned of
22  defendants' revenue sharing is not a mere oversight or coincidence.  Had she specified the source
   of such information (either the 2004 Prospectuses themselves or the December 30, 2004
23  Amendment) she would have drawn attention to the untimeliness of her claims.

   [13] The Supreme Court ruling did "not disturb" the Seventh Circuit rejection of group-pleading.
24  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- S.Ct. ---, 2007 WL 1773208 at *11 n. 6 (June 21,
   2007) .

25     [14] As the above-cited cases show, the so-called "group pleading" doctrine is inconsistent with the
   Reform Act and thus, is no longer viable.  However, even if the doctrine had survived, it would
26  not be applicable here.  That doctrine permitted a company's public statements to be attributed to
   its **individual officers and directors** if the plaintiff pleaded that such officers and directors
27  actively participated in the management of the business; it did not permit a collection of related
   **entities** to be treated as an indiscriminate collective for purposes of pleading scienter.  *See In re*
28  *Glenfed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995); *Wool v. Tandem Computers, Inc.*, 818

1   Because of the impermissible vagueness and generality of Plaintiff's fraud allegations,

2   those allegation should be disregarded and Plaintiff's fraud claims should be dismissed.

3   **2.      Plaintiff Has Not and Cannot Plead Facts Establishing a Strong Inference of Scienter.**

4

5   In addition to the Reform Act's heightened standard for pleading falsity, the statute also

6   requires that the plaintiff set forth "in great detail" specific factual allegations that establish

7   scienter – *i.e.*, "strong circumstantial evidence of deliberate recklessness or conscious

8   misconduct." *Silicon Graphics*, 183 F.3d 970, 974 (9th Cir. 1999).  The Supreme Court recently

9   clarified what plaintiffs must do to establish a "strong inference" of scienter.  *See Tellabs,* 2007

10  WL 1773208 at *10.  In applying this standard on a motion to dismiss, a court does ***not*** make all

11  reasonable inferences in favor of the non-moving party:  inferences of scienter that are merely

12  "plausible," "reasonable," or "permissible" will lead to dismissal.  *Id.*  Instead, a court must

13  compare the inference urged by plaintiffs with all other possible inferences.  *Id.*  "A complaint

14  will survive…only if a reasonable person would deem the inference of scienter cogent and at least

15  as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

16  Applying the *Tellabs* standard, Plaintiff will never be able to plead facts supporting a

17  "strong inference" that defendants intended the 2004 Prospectuses to deceive the investing public.

18  Plaintiff's scienter allegations are confined to three brief paragraphs.  Summarized

19  succinctly, Plaintiff makes the following conclusory assertions:

20  - "WAMU" knew that the 2004 Prospectuses were false and misleading; (Compl.

21    ¶ 36)

22  - "WAMU" "knowingly and substantially participated or acquiesced in the issuance

23    or dissemination of such statements"; (*id.*)

24  - "WAMU . . . culpably participated in the fraudulent course of conduct" . . . "by

25    virtue of their possession of information reflecting the true facts"; (*id.*)

26  F.2d 1433, 1440 (9th Cir. 1987) (superseded by statute on other grounds) (finding group-pleading

27  sufficient where plaintiffs alleged that a "narrowly defined group of officers" had day-to-day involvement in company affairs and registration statement preparation); *see also In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 169–70 (D.Mass. 2002) (rejecting arguments attempting

28  to extend group-pleading doctrine to related corporate entities).

- "WAMU's directors knew that revenue-sharing arrangements were already in place but left in place watered-down disclosures"; (*id.* ¶ 37) and

- "WAMU" "later disclosed its actions only after the scandals in the mutual fund industry were revealed to the public."  (*Id.* ¶ 37.)

The linchpin of all these bare-bones assertions is the assumption that the disclosures in the 2004 Prospectuses were not only incomplete, but were so radically deceptive that they could only have been the result of fraudulent intent.

Plaintiff's assumption is groundless.  For, as shown earlier, the disclosures in the 2004 Prospectuses were, in fact, entirely accurate and appropriate.  Particularly when taken as a whole, the 2004 Prospectuses truthfully disclosed the revenue-sharing arrangements among WM Advisors, WM Funds Distributor, and the various broker-dealers that sell the Funds.

Yet even assuming (solely for the sake of argument) that the disclosures in the 2004 Prospectuses were not as complete as they might have been, it is simply not credible to suggest – in the face of such disclosures – that the defendants had a conscious plan to dupe investors or an intent to conceal a "kickback" scheme.  Plainly, someone who is trying to conceal revenue sharing does not place a complete copy of its form revenue-sharing agreement into the public record.  Far from supporting a strong inference of scienter, the disclosures in the 2004 Prospectuses strongly suggest that the author of the 2004 Prospectuses had no intent to mislead.[15] The opposite inference – if any were possible – would be extremely weak.

Because the Complaint's allegations do not support a strong inference of scienter, Plaintiff's fraud claims – Counts 4, 5, and 6 – should be dismissed.

---

[15] Plaintiff also argues that because subsequent prospectuses amended the wording of the disclosures, defendants must have known that the 2004 Prospectuses' disclosures were deficient. But this is precisely the type of "fraud by hindsight" pleading rejected by multiple circuits.  *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 31 (1st Cir. 2002); *Retirement Sys. v. Hunter*, 477 F.3d 162, 183 (4th Cir. 2007); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1084–85 (9th Cir. 2002) (observing that the purposes of the Reform Act's heightened pleading requirement include eliminating the pleading of "fraud by hindsight").  Scienter analysis turns on what defendants knew or must have known at the time of the alleged misstatements; evidence of later changes to the prospectuses in no way demonstrates what defendants knew earlier.

1

## C.      Plaintiff Has Not and Cannot Plead Cognizable Loss Causation.

2          In addition to requiring securities fraud plaintiffs to plead detailed facts supporting a

3  strong inference of scienter, the Reform Act also requires them to plead facts showing that the

4  defendants' alleged misrepresentation was the cause not only of the plaintiffs' decision to

5  purchase or sell the security (so-called "transaction causation") but also that "the defendant's

6  misrepresentation (or other fraudulent conduct) ***proximately caused*** the plaintiff's economic

7  loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  Under this "loss-causation"

8  requirement, it is not enough for plaintiffs to allege that "the price on the date of purchase was

9  inflated because of the misrepresentation," nor is it sufficient to plead that the stock has

10  subsequently declined in value.  *Id.*  Instead, the Reform Act requires the plaintiff to show that the

11  discovery of the alleged falsehood is what caused the plaintiff her concrete economic loss –

12  typically, by causing the stock price to drop as soon as the truth became known.

13          The lower federal courts have vigorously enforced these loss-causation rules in mutual

14  fund cases involving revenue-sharing payments by fund distributors or advisors.  For example, in

15  *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006), the

16  court considered and rejected each of the plaintiff's theories of loss.  First, the plaintiffs claimed

17  that, but for the defendants' failure to disclose their revenue sharing, the plaintiffs would not have

18  purchased shares in the funds.  The court concluded that this was an allegation of "transaction

19  causation" – not "loss causation."  *Id.* at 589.  Second, the plaintiffs argued that they had paid

20  excessive fees in order to fund the revenue-sharing obligations of their fund's advisor and

21  distributor.  The court rejected that theory as well:  because the total amount of fees had been

22  disclosed, and it was the total fees that impacted the value of the funds – not how those funds

23  were allocated – the plaintiffs had failed to link the allegedly misleading non-disclosure to any

24  identifiable loss.  *Id.* at 590.  Third, the plaintiffs contended that, because of the defendants'

25  failure to disclose their revenue sharing, the plaintiffs had invested in the subject funds rather than

26  other more profitable investments.  The court rejected this theory as well, on the ground that

27  hypothetical earnings on an investment that the defendants had never made was not a cognizable

28  loss at all.  *Id.* at 589 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) for

- 16 -

1   principle that securities fraud plaintiffs may not seek recovery based on purchases or sales that

2   misleading information allegedly induced them *not* to make).  *Accord Castillo v. Dean Witter*

3   *Discovery & Co.*, Case No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998).

4         As in *Salomon Smith Barney*, the Complaint does not adequately plead loss causation.

5   The primary loss that Plaintiff alleges is, in effect, the opportunity cost of having chosen to buy

6   into the Funds rather than some other (assertedly more profitable) investment.  (Compl. ¶ 43.)  A

7   second form of loss claimed by Plaintiff is the alleged diminution of her mutual funds' net asset

8   value ("NAV") because of the fees charged by WM Funds Distributor and WM Advisors (which

9   they used, in part, to defray revenue-sharing obligations).  For precisely the reasons articulated in

10  *Salomon Smith Barney*, these loss theories must be rejected.  *Accord Merrill Lynch*, 434 F. Supp.

11  2d at 238-39; *Castillo*, 1998 WL 342050, at * 4-6.

12         **D.     As a Matter of Law, Each of Plaintiff's Causes of Action Is Time-Barred.**

13         Claims under Sections 11, 12(a)(2), and 15 of the Securities Act (Counts, 1, 2, and 3 of

14  the Complaint) are subject to the limitations provision at Section 13 of the same statute:  they

15  must be commenced "within one year after the discovery of the untrue statement or the omission,

16  or after such discovery should have been made by the exercise of reasonable diligence" but in no

17  event later than three years after the sale or public offering of the security.  15 U.S.C. §77m;

18  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993).

19         Unlike claims under the Securities Act, claims of securities fraud under Sections 10(b)

20  and 20 of the Exchange Act (Counts 4, 5, and 6 of the Complaint) require plaintiffs to plead and

21  prove fraudulent intent on the part of the defendant.  Under Section 804(a) the Sarbanes-Oxley

22  Act of 2002,

23  ,[16] such fraud claims must be brought within two years of the discovery of the facts constituting

24  the fraud, and in no event later than five years from the date of the defendant's alleged

25  misconduct.  *See* 28 U.S.C. §1658(b).[17]

26  _____

[16] Pub. L. No. 107-204, 116 Stat. 745, 801 (codified at 28 U.S.C. § 1658(b)).

27  [17] Before the enactment of Sarbanes-Oxley, claims of securities fraud under Sections 10(b) and 20

28  of the Exchange Act had a limitations period closely akin to the one applicable to non-fraud-
    based claims under the Securities Act.  They had to be brought "within one year after the

1   Like the statute of limitations applicable to claims under the Securities Act, the limitations

2   period for claims of securities fraud under the Exchange Act embodies the rule of "inquiry

3   notice" – *i.e.*, the limitations period begins to run on the date when the plaintiff should have

4   discovered the fraud through the exercise of reasonable diligence.  *See Betz v. Trainer Wortham*

5   *& Co., Inc.*, 486 F.3d 590, 596 (9th Cir. 2007).  Under the rules of inquiry notice, which the Ninth

6   Circuit expressly adopted from the Tenth Circuit, the court first considers when a plaintiff has

7   notice of facts that create sufficient suspicion to cause a reasonable investor to investigate the

8   matter further.  *See id.*  To establish the investor's duty of further investigation, all that is required

9   is that the publicly available information provide "evidence of the ***possibility*** of fraud, not full

10  exposition of the scam itself."  *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202-04 (10th Cir. 1998)

11  (cited in *Betz*).  Such information can come in any number of forms – even unflattering news

12  articles in business magazines.  *See id.* at 1204.

13  After determining that the plaintiff has notice sufficient to trigger the obligation to

14  investigate, the inquiry-notice rule then requires the court to determine when, in the course of a

15  reasonably diligent investigation, the investor would have discovered the facts constituting the

16  alleged fraud.  *Betz,* 486 F.3d at 596.  The statute of limitations runs from that point.  *Id.*

17  Whether an investor has inquiry notice, and when, in the exercise of reasonable diligence,

18  she would have discovered the facts underlying her claim, are objective questions suitable for

19  resolution as a matter of law where uncontroverted evidence demonstrates when the plaintiff

20  discovery of the facts constituting the violation and within three years after such violation."
*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 (1991).  However,
Sarbanes-Oxley extended the limitations period for private causes of action for securities fraud

21  and, because fraudulent intent is an element of claims under Section 10(b) and 20 of the
Exchange Act, the extended limitations provision of Sarbanes-Oxley applies to those Exchange

22  Act claims.  Because fraud is not an element of claims under Sections 11, 12(a)(2), and 15 of the
Securities Act, Sarbanes-Oxley's extended limitations period does not apply to them.  *See, e.g., In*

23  *re Alstom SA Sec. Litig.*, (S.D.N.Y. 2005); *accord Fitzgerald v. Citigroup, Inc.*, No. 03 CV 4305
(DAB), 2007 WL 582965 (S.D.N.Y. June 25, 1998); *In re Enron Corp. Sec., Derivative & ERISA*

24  *Litig.*, 465 F. Supp. 2d 687, 711 n.33 (S.D. Tex. 2006); *Cohen v. Northwestern Growth Corp.*,
385 F. Supp. 2d 935, 942 (D.S.D 2005); *Lieberman v. Cambridge Partners, L.L.C.*, Civ. A 03-

25  2317, 2004 WL 1396750, at *3 n.14 (E.D. Pa. June 21, 2004) (same); *Friedman v. Rayovac*

26  *Corp.*, 295 F. Supp. 2d 957, 975 (W.D. Wisc. 2003); *see also In re Authentidate Holdings Corp.*,
No. 05 CV 5323 (LTS), 2006 WL 2034644 (S.D.N.Y. July 14, 2006) (where plaintiff disclaims

27  fraud as basis for Securities Act causes of action, Section 804 of Sarbanes-Oxley does not apply);
*In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 443 (S.D.N.Y. 2003) (same).

28

1   discovered or should have discovered the fraudulent conduct.  *Id.* at 597.  For example, in

2   applying the inquiry-notice rules, the courts have concluded, as a matter of law, that, once on

3   notice of the "possibility" of fraud, a reasonably diligent investor would ***immediately*** consult

4   publicly available securities filings where the relevant facts might be disclosed, and that, where

5   such filings disclose the facts underlying the plaintiff's claims, the statute of limitations begins to

6   run immediately.  *See Sterlin v. Biomune Sys., Inc.*, 114 F. Supp. 2d 1163, 1172 (D. Utah 2000),

7   *on remand from Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202-04 (10th Cir. 1998) (applying

8   Tenth-Circuit inquiry-notice rules adopted in *Betz*).  *Accord Whirlpool Fin. Corp.,* 67 F.3d at 610

9   ("A reasonable investor is presumed to have information in the public domain, and therefore . . .

10   is imputed with constructive knowledge of this information."); *Infonet,* 310 F. Supp. 2d at 1114

11   n.7 (C.D. Cal. 2003) (same).

12       Hence, the federal courts of appeal have routinely concluded, as a matter of law, that

13   public securities filings provide investors with inquiry notice of their potential claims, thus

14   triggering the running of the relevant limitations periods.  *See Dodds*, 12 F.3d at 352-53

15   (affirming dismissal based on inquiry notice provided by statements in securities prospectus);

16   *accord Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

17
        **1.**        **The 2004 Prospectuses Gave Plaintiff Inquiry Notice of the Facts
                Underlying Her Purported Claims.**

18

19       For the reasons already discussed, there is no merit to Plaintiff's Complaint.  The

20   disclosures in the 2004 Prospectuses were not materially misleading, and Plaintiff has not pleaded

21   facts showing that any of the defendants had an intent to deceive.  Yet even if there were merit to

22   one or more of Plaintiff's claims, each such claim is clearly time-barred because the 2004

23   Prospectuses themselves – filed and made publicly available on February 27, 2004 – put Plaintiff

24   on inquiry notice of existence of her claims over three years before she filed suit.

25       As Plaintiff herself has certified, she purchased shares from the Funds in the year 2000.

26   (Cambel Decl., Exh. A.)  Thus, from that date forward, she was on inquiry notice of the facts

27   disclosed in the Funds' public filings with the SEC.  *See Whirlpool Fin. Corp.*, 67 F.3d at 610;

28   *Infonet*, 310 F.Supp.2d at 1114 n.7.  These public filings included the 2004 Prospectuses

1  themselves – the moment they were filed.[18]

2      Nor, indeed, was Plaintiff's knowledge of those documents purely constructive.  The

3  Complaint itself leaves no doubt that she ***actually received*** the 2004 Prospectuses (Compl.,

4  ¶ 34) – presumably, as she had received each amended prospectus following her purchase of

5  shares in the Funds in the year 2000.

6      By Plaintiff's own admission, even the short portion of the 2004 Prospectuses that is

7  quoted in the Complaint was sufficient to cause a reasonable investor "to believe that the kick-

8  back and incentive programs *may* or *may not* exist. . . ."  (Compl., ¶ 33; emphasis in original.)  In

9  other words, even that section of the 2004 Prospectuses gave Plaintiff notice of the "possibility"

10 that the defendants were engaged or would engage in precisely the so-called "kickback" scheme

11 that Plaintiff asserts as the basis of the present lawsuit.  At a minimum, that was enough to trigger

12 Plaintiff's obligation to investigate further.  *See Sterlin*, 154 F.3d at 1202–04.  *Accord Benzon*,

13 420 F.3d 598, 612 (6th Cir. 2005) (noting that prospectus language indicating that revenue

14 sharing "may" be in effect, "served to put prospective investors on notice that there was a

15 possibility that brokers were being compensated more highly for sale of certain class shares than

16 others, such that investors could pursue that line of inquiry with their financial advisors. . . .").

17     Had Plaintiff promptly undertaken the necessary investigation, as the law requires, her

18 suspicions regarding the defendants' alleged improprieties would have been confirmed by other

19 portions of the 2004 Prospectuses which, as shown above, made it clear that revenue sharing was

20 not a mere possibility (as the quoted portions of the Prospectuses allegedly conveyed) but an

21 ongoing reality.  As shown in the form Broker-Dealer Agreement that was included as an exhibit

22 in the 2004 Prospectuses (Cambel Decl., Exh. B at 21–31), the Funds' public filings as of

23

---

24 [18] As noted earlier (fn. 5, *supra*) the fact that the proposed effective date of the 2004 Prospectuses
   was March 1, 2004 does not alter this analysis.  The effective date of a registration statement
25 determines, *inter alia*, when an issuer can be held liable for any misleading statements the
   registration statement contains; the effective date has no effect on when the facts thereby
26 disclosed became publicly available information.  As sources of insides information about the
   defendants' activities, the facts disclosed in a pre-effective registration statement are entitled to at
27 least as much weight as the kind of unflattering news articles that typically give rise to inquiry
   notice.  *Cf. Sterlin*, 154 F.3d at 1202–04 (affirming district court ruling that news article put
28 securities investor on inquiry notice because it raised the "possibility of fraudulent activity").

1  February 27, 2004, showed that both WM Funds Distributor and WM Advisors were then

2  currently making revenue-sharing payments to WM Financial Services in connection with their

3  efforts to promote the Funds.  These are the core facts underlying Plaintiff's Complaint and the

4  core facts about which the defendants allegedly misled the investing public.  Even if Plaintiff had

5  not actually received copies of the complete 2004 Registration Statement (which the Complaint

6  alleges she did) (Compl. ¶¶ 29 and 34), her awareness of the "possibility" of a so-called

7  "kickback" scheme triggered her duty to make a further investigation, including an "immediate"

8  review of the complete registration statement, within which the form Broker-Dealer Agreement

9  was included.  *See Sterlin*, 114 F.Supp.2d at 1172.

10  Hence, Plaintiff's own admissions confirm that, as of February 27, 2004, Plaintiff became

11  aware of the "possibility" of defendants' alleged wrongdoing and thus had an obligation to make

12  further inquiries.  What is more, facts subject to judicial notice show that a reasonable

13  investigation into the readily accessible public filings (which Plaintiff admits she actually

14  received) would have led to the immediate discovery of the exact facts underlying Plaintiff's

15  claims.

16  Given that the statute of limitations on Plaintiff's claim began to run on February 27,

17  2004, each of her causes of action is clearly time-barred.  Her claims under the Securities Act had

18  to be brought within one year of that date – *i.e.*, by February 27, 2005; instead, they were brought

19  on February 28, 2007 – two years and one day too late.  Similarly, Plaintiff's claims under the

20  Exchange Act had to be brought within two years – *i.e.*, by February 27, 2006; when those claims

21  were filed on February 28, 2007, they were over a year past-due.

22
       **2.**    **Even if the 2004 Prospectuses Had Not Fully Uncovered the Facts underlying Plaintiff's Purported Claims, the December 30, 2004 Amendment Undeniably Did.**
23

24  Plaintiff may attempt to respond that the contents of the 2004 Prospectuses were not

25  sufficiently explicit to permit discovery of the actual facts underlying her present lawsuit.  Even if

26  this were true (which it is not), it would not be enough to save her claims from the applicable

27  statutes of limitations, because the subsequent filing of the December 30, 2004 Amendment set

28  forth those facts in even more expansive detail, two years and two months before Plaintiff filed

- 21 -

1   the present action.

2          As noted earlier, knowledge of publicly available securities filings is imputed to all

3   reasonable investors.  *See Whirlpool Fin. Corp.*, 67 F.3d at 610; *Infonet*, 310 F.Supp.2d at 1114

4   n.7.  What is more, Plaintiff's own Complaint effectively concedes that she was on notice of the

5   "possibility" of defendants' alleged misconduct based on the 2004 Prospectuses and therefore – at

6   a minimum – had an obligation to conduct a reasonable investigation of the contemporaneous

7   public filings and filings made thereafter.  Had she conducted such an investigation, on December

8   30, 2004, she would have obtained actual knowledge of the contents of the December 30, 2004

9   Amendment, in addition to the constructive knowledge imputed to her by law.

10          The facts set forth in the December 30, 2004 Amendment describe in minute detail the

11   defendants' existing revenue-sharing arrangements and even highlight that such arrangements

12   could potentially influence the advice given by retail brokers.  The most relevant passages from

13   the December 30, 2004 Amendment read as follows:

14                    PAYMENTS TO INVESTMENT REPRESENTATIVES AND
                      THEIR FIRMS
15

16                    Financial intermediaries market and sell shares of the Portfolios.
                      These financial intermediaries receive compensation from the
17                    Distributor and its affiliates for selling shares of the Portfolios
                      and/or providing services to the Portfolios' shareholders.  Financial
18                    Intermediaries may include, among others, your broker, your
                      financial planner or advisor, banks, pension plan consultants and
19                    insurance companies.  Investment representatives who deal with
                      you and other investors on an individual basis are typically
20                    associated with a financial intermediary.  The Distributor and its
                      affiliates may fund this compensation from various sources,
21                    including any sales charge, CDSD and/or Rule 12b-1 fee that you
                      or the Portfolios pay to the Distributor.  Your individual investment
22                    representative may receive some or all of the amounts paid to the
                      financial intermediary with which he or she is associated.

23                                            * * *

24                    In addition to the foregoing sales commissions, dealer reallowances
                      and ongoing payments, your investment representative's financial
25                    intermediary firm receives compensation from the Distributor and
                      its affiliates for additional distribution services, defrayal of costs for
26                    educational seminars, training and marketing, and payments related
                      to providing shareholder record-keeping and/or transfer agency
27                    services.

28                    WM ADVISORS ALSO OFFERS REVENUE SHARING
                      PAYMENTS . . . TO ALL FINANCIAL INTERMEDIARIES

NB1:719636.1                                    - 22 -           MEMO P'S & A'S IN SUPP PRINCIPAL
                                                                GROUP DEFENDANTS' MTD (07CV00385)

WITH ACTIVE SELLING AGREEMENTS WITH THE DISTRIBUTOR. THE ADVISOR FEE IS PAID AT AN ANNUAL RATE OF UP TO 0.50% OF THE AVERAGE NET ASSETS OF CLASS A AND CLASS B SHARES OF THE PORTFOLIOS SOLD THROUGH SUCH INTERMEDIARIES. . . .THESE PAYMENTS ARE MADE FROM WM ADVISORS' PROFITS AND MAY BE PASSED ON TO YOUR INVESTMENT REPRESENTATIVE AT THE DISCRETION OF HIS OR HER FINANCIAL INTERMEDIARY FIRM. THESE PAYMENTS MAY CREATE AN INCENTIVE FOR THE FINANCIAL INTERMEDIARIES AND/OR INVESTMENT REPRESENTATIVES TO RECOMMEND OR OFFER SHARES OF THE PORTFOLIOS OVER OTHER INVESTMENT ALTERNATIVES.

In addition to the commissions paid at the time of sale, ongoing payments and the Advisor Paid Fee, some or all of which may be paid to financial intermediaries (and, in turn, to your investment representative), the Distributor and its affiliates, at their expense, currently provide additional payments to financial intermediaries that sell shares of the Portfolios for distribution services and educational support. . . .

* * *

A number of factors are considered in determining the amount of these additional payments, including each financial intermediary's WM Group of Funds sales, assets and redemption rates, and the willingness and ability of the financial intermediary to give the Distributor access to its investment representatives for educational and marketing purposes. In some cases, financial intermediaries will include the WM Group of Funds on a "preferred list." The Distributor's goals include making the investment representatives who interact with current and prospective investors and shareholders more knowledgeable about the WM Group of Funds so that they can provide suitable information and advice about the Portfolios and related investor services.

IF ONE MUTUAL FUND SPONSOR MAKES GREATER DISTRIBUTION ASSISTANCE PAYMENTS THAN ANOTHER, YOUR INVESTMENT REPRESENTATIVE AND HIS OR HER FINANCIAL INTERMEDIARY MAY HAVE AN INCENTIVE TO RECOMMEND ONE FUND COMPLEX OVER ANOTHER. SIMILARLY, IF YOUR INVESTMENT REPRESENTATIVE OR HIS OR HER FINANCIAL INTERMEDIARY RECEIVES MORE DISTRIBUTION ASSISTANCE FOR ONE SHARE CLASS VERSUS ANOTHER, THEN THEY MAY HAVE AN INCENTIVE TO RECOMMEND THAT CLASS.

Please speak with your investment representative to learn more about the total amounts paid to your investment representative and his or her financial intermediary by the Portfolios, the Distributor, WM Advisors and by sponsors of other mutual funds he or she may recommend to you. You should also consult disclosures made by your investment representative at the time of purchase.

1  (Cambel Decl., Exh. C at 35–37.)

2       Without a doubt, the above-quoted disclosure was more than sufficient to confirm all the

3  facts necessary for Plaintiff to discover the existence of her purported claims.  Hence, at the very

4  latest, the relevant limitations periods began to run as of December 30, 2004 – the date on which

5  Plaintiff had constructive knowledge of the above-disclosed facts, and the date on which on

6  which she would have had actual knowledge of the relevant facts, in the exercise of reasonable

7  diligence.  At the very latest, Plaintiff had to bring her Securities Act claims (Counts 1, 2 and 3)

8  within one year of that date (*i.e.*, by December 30, 2005) and her Exchange Act claims (Counts 4,

9  5 and 6) within two year of that date (*i.e.*, by December 30, 2006).  When Plaintiff finally filed

10  her Complaint on February 28, 2007, all of these causes of action were already time-barred.

11       Because the admissions currently on file and the materials subject to judicial notice

12  demonstrate that all of Plaintiff's causes of action are time barred, her Complaint should be

13  dismissed with prejudice.

14  **E.    The Court Should Dismiss the Complaint as to Those Principal Group Defendants Against Whom No Claims Have Been or Can Be Properly Asserted.**

15

16       Even if the Court were disinclined to dismiss the Complaint on any of the foregoing

17  grounds, several of the Principal Group Defendants should be dismissed from this lawsuit – or

18  from certain causes of action – because no claims have been specified against them or because, as

19  a matter of law, certain claims may not be directed against them.  Because none of the

20  Complaint's six causes of action is asserted against any of the Principal Group Defendants except

21  WM Funds Distributor and WM Advisors, the Complaint should be dismissed in its entirety as to

22  the following named defendants:

23      • Principal Financial Group

24      • Principal Investors Funds

25      • Principal Funds Distributor

26      • Edge Asset Management

27

28

- 24 -

IV.     **CONCLUSION**

         For all the foregoing reasons, as well as those articulated in the moving papers of

defendants Washington Mutual and WM Financial Services, the Principal Group Defendants

respectfully request that the Court dismiss this action with prejudice.

         Dated: June 25, 2007                    PHILLIP R. KAPLAN
                                                 MARCUS S. QUINTANILLA
                                                 ANDREW R. ESCOBAR
                                                 O'MELVENY & MYERS LLP


                                                 By:  s/Phillip R. Kaplan

                                                 Attorneys for Defendants
                                                 WM Advisors, Inc., WM Funds Distributor,
                                                 Inc., Edge Asset Management, Inc., Principal
                                                 Financial Group, Inc., Principal Investors
                                                 Fund, Inc., Principal Funds Distributor, Inc.

                                                 E-mail:  pkaplan@omm.com